Morning. We'll call our first case, Lara v. Commissioner of Pennsylvania State Police. Good morning, Your Honors, and may it please the Court, John Ohlendorf for the appellants. With Court's permission, I'd like to reserve five minutes of time for rebuttal. Done. Your Honors, declared emergencies are unfortunately a common occurrence in Pennsylvania, from hurricanes to opioids, winter storms to highway collapses, an emergency has been declared on average about once every six months over the last 20 years. The theory of the Second Amendment is that during times of crisis, the individual right to armed self-defense is of the highest importance. Yet under the combined force of the three laws challenged here, Pennsylvania has barred 18 to 20-year-old adults from carrying firearms in public for self-defense during each of these declared emergencies, even carrying them openly as they're ordinarily entitled to do. Is that the issue here? Yeah. Open carry or concealed carry? Your Honor, my clients would like to carry in some manner. We think that's what Heller guarantees, the right to carry in some manner, either openly or concealed. It's really up to the state which one they want to allow, but what the state can't do is foreclose both. So let's jump into the mootness point here. There's been a constitutional amendment in Pennsylvania. There is no current state of emergency. Your friends across the aisle there have said that capable of repetition is not a synonym for mere speculation. What's your response? Your Honor, my response is that it is far from speculation to suggest that an emergency is going to be declared again statewide. In fact, there's one— Would you infer that from what you just mentioned a few moments ago concerning the frequency with which states of emergency have been declared in the last so many decades in Pennsylvania? That's correct, Judge Smith. We think from the fact that an emergency has been declared again on average once every six months, it is an extremely fair inference that another one will be declared again soon. No one can say when, but what you can say is that it will happen. There is an emergency that was declared on June 12th, limited to Pennsylvania, which again illustrates the frequency with which these occur. And I would point the Court to this Court's decision in Balitskis v. Pitts and Grilley, which involved an election challenge where the Court founded— Stop. What was the June 12th emergency? It was a statewide emergency in Pennsylvania? No, Your Honor, that emergency was limited to Philadelphia based on the I-95 highway collapse. And I point to it only to suggest that it is a continuing sign of the frequency with which these emergencies are declared. And the authority to declare an emergency rests not only with the governor, but certain local officials have the authority to declare an emergency within their own jurisdiction, do they not? I believe that's right, Judge Smith, but certainly the governor has authority still even under the recent constitutional amendment to declare statewide emergencies limited to 21 days, but a 21-day infringement of Second Amendment rights is still an infringement of Second Amendment rights, and indeed that shows— Sorry, Judge Jordan. A local emergency like the Philadelphia highway collapse, does that implicate these three Pennsylvania statutes? Do they kick into effect and deprive 18- to 21-year-olds of the right to carry? My understanding is that it does, Judge Jordan. Now, that effect may be limited to the locality where the emergency is in place. We haven't briefed that issue, but even if that is so, again, a deprivation of constitutional rights in Philadelphia is still a deprivation of constitutional rights. So I think it is certainly under the Pits and Grilly case a fair inference. There the court inferred that someone who had stood for election would stand for election again. I think it's an equally fair inference that emergencies that have been declared with this frequency will be declared again. Briefly on the evading review point, I think the history of this litigation alone shows that these emergencies evade review. Seven of the last ten declared emergencies lasted for 90 days or less. Under this constitutional amendment that my friend points to, indeed, the governor's authority unilaterally to declare emergencies is limited to 21 days. And under this court's case law, that's plainly a short enough duration to evade review. Well, let's move to the timeframe here, because between, you know, there's been moving targets here, and we have a new authority coming out of the 11th Circuit, which your friends on the other side are pretty happy about, the Bondi case, which looks at the reconstruction era as the pertinent time period. We got a page and a quarter from you on that. Why don't you dilate on that at a little more length, and, in particular, address, if you would, the assertion the court makes, and highlighted by your friends in their letter bringing it to our attention. It would be odd, indeed, if the people who adopted the 14th Amendment did so with the understanding that it would invalidate widely adopted and widely approved gun regulations at the time. That's the language from page 11 of the slip opinion from Bondi. What's your answer to that? Well, let me advance two answers to that, Judge Jordan. The first, very briefly, is that even that proposition is not enough to justify Pennsylvania's law, because at the time the 14th Amendment was ratified in 1868, there were only two or three states that imposed any sort of age-based restriction on firearms, keeping and bearing firearms. So that obviously falls short of a widely- You make a distinction between carry and purchase, I guess, when you talk about that, are you? Are you saying there were only two or three, period, across the whole country? We do make that distinction. I think it's a significant one, Judge Jordan. But here I'm saying there are only two or three of any kind, carry, purchase, possession, only two or three age-based restrictions of any kind, Tennessee, Alabama, and Kentucky, depending on when you count Kentucky. So the 11th Amendment statement of widely adopted and widely approved gun regulations at that time, I guess you're telling us that's a gross exaggeration. That's point one, Your Honor. Point two is, candidly, we think the 11th Circuit got the correct time frame wrong. We think the proper time frame to look at is 1791 when the Second Amendment was ratified, not 1868 when the 14th Amendment was ratified. 1791 was the age of majority at that time. Your Honor, the age of majority depended on what right you were talking about. For some rights it was 21, and I think that was, you know, seen as kind of the- Most rights were 21. The final age. Well, you know, in the Blackstone commentaries, which is the source that the amici for my friends points to, he walks through kind of the different age limits. Some were 12, some were 14, some were 17. They vary based on gender. So I don't think one can say that there was one prevailing age of majority, but certainly 21 was the upper age of majority, and for many rights, 21 was the limit. And others were considered minors at the time, right? They were considered minors in the eyes of the law. That's correct, Your Honor. I understand you're arguing about the militias, but that was an obligation, not a right. In other words, the folks that had to participate in the militias, they were allowed to carry firearms, but there's some historical support for the fact that the parents had to sign off on these or provide the weapons. Isn't that right? In one or two states, Judge Estrepo, the parents were expected to provide the weapons. One or two states. One or two states. Your Honor, I certainly think it's less than the majority of states, a handful of states, and maybe more than two. I do not think it is most states, certainly not all states. And the expectation was that the parent would provide their children with firearms to the extent that they weren't able to acquire them themselves. They weren't allowed to acquire them. That's why the parent had to provide it. I don't know of any evidence of that, Your Honor, that they were not allowed. At the founding, the state has cited no age-based restriction on acquiring firearms in that period. What do we make of age restrictions at universities and colleges at that time that firearms weren't permitted on campus, including Thomas Jefferson's University of Virginia? Yes, Judge Estrepo, so there were a couple of universities, including state universities, that imposed those types of requirements. My understanding is that was based on the state or the school's authority to act in loco parentis, in the place of the parent. So certainly we don't dispute that. And some of the historical evidence, secondary sources submitted, very clearly show robust evidence of the authority that parents had over the children living within their household. And we do not dispute that. But that is a very separate question from governmental authority. Putting aside the specific restrictions that may or may not have existed at a point in time, help me, if you would, please, with what Bruin teaches ought to be our historical focus here. Because it seems to me that before we can consider and even go so far as, forgive me the use of this term, give weight to certain restrictions, be they statutes, ordinances, rules, regulations, whatever, what does Bruin tell us should be the historical focus? Is it 1791 or is it 1868? Or may one be aided by reference to the other if a historical analog can be found? So, Your Honor, the key date. I mean, isn't that really what Bruin requires us to do here analytically? We think the key date under Bruin is 1791 because that is the time when the Second Amendment was ratified. Your Honor, I see my time has expired. May I? Go ahead. And if you ask yourself what kind of debate there was in 1868 when the 14th Amendment was ratified, I think this is a key error that the 11th Circuit made. There was a robust debate, and there's a great deal of historical evidence for this, over whether to impose federal limits on the states. There was no debate over the substance of those federal limits. If you want to find out when ratifiers considered the substance, the scope of the right, that applied to the federal government and was now being extended to the state, you have to look to 1791. That is when there was a public debate among the ratifiers over the nature and scope of the right. So we think 1791 is the date, and we think… All right, but doesn't Bruin go a little bit farther than that, or at least in terms of its focus on the date or the era, if you will, in suggesting that 19th century firearms restrictions are relevant to the extent that they don't contradict earlier evidence? That's certainly correct, Judge Smith. We think certainly the immediate decades after ratification into the 1820s, highly relevant evidence about what the ratifiers understood the text to mean. Bruin and Heller both looked to later evidence as well. Now… But we are not mired for once and for all in 1791. We're right around that time. The question is always what was the scope of the right in 1791. Now, the court can look to later evidence to confirm earlier historical evidence answering that question. Bruin is crystal clear that what the court cannot do and what the government may not do is pick up laws in the late 19th century that contradict the weight of earlier historical evidence and rely upon those laws, isolated, late-breaking laws. When you say it's crystal clear that that's what Bruin was saying, Bruin seemed to explicitly say we're not answering that question. Here's some things to think about. You know, there's a danger in giving too much weight to later evidence, later arising laws. Watch out for that. There's some dicta in there about what to be cautious about. But point me to something in Bruin where it's crystal clear that 1791 is the date. Your Honor, I don't have the exact language in front of me. Now… Well, give me sort of generally where you're at. And, Judge Jordan, just to be clear, what I think is crystal clear from Bruin is not that 1791 is the correct date. The Bruin court does leave that question open. We think, as we've read from the papers, it's decided by other Supreme Court precedent. But what Bruin is crystal clear about is that late 19th century evidence is not instructive when it contradicts earlier founding-era evidence. Okay. Then take me to that language, when it, quote, contradicts. Your Honor, it may take me a minute or two to… Well, I'll tell you what. Why don't you… I'll come back to it with rebuttal. I'll come back to it with rebuttal and point us to that specific language. Could I ask a question? Yeah. Well, we're not finished. We're going to keep going here. I'm just saying, I don't want to take time right now. We've all got some more questions for you. My question for you right now is on the standing point. I don't want to lose the opportunity to ask you about that. There's this argument about supplementing the record. I take it that that's still in dispute. One of the reasons that's important, I think, is because capable of repetition yet evading review, exception to mootness that you're leaning on, requires not just that there be this possibility to arise again, but that the same party could be affected. So clearly the same named plaintiff individuals are not going to be affected because they've aged out. Do you have some authority for the assertion that the association maintains its standing and therefore will be affected so that mootness issue is not a problem? Well, I have authority, Your Honor, for the proposition that a live associational plaintiff withstanding does prevent a case from mooting out when the individual named plaintiffs are mooted out. That was what the Ninth Circuit held in the Jones v. Bonta case, and it follows from just the logic of standing. And I do think, Your Honor, correct, it has to be one of the parties before the court that is likely to be affected again, and here two of the parties before the court, the two organizational plaintiffs. Is Bonta still a case that we could cite? Bonta has, Your Honor, all of the authority that it ever had in this court, which is persuasive authority, the power of Judge Nelson's reasoning to persuade. What happened in the case? Your Honor, I believe it's been vacated for reconsideration below in light of Bruin. But, again, we would certainly suggest it retains its persuasive authority. And I don't think the state disputes that if the organizational plaintiffs do continue to have an interest, that would prevent this appeal from being mooted out. And, Your Honor, we alleged squarely with respect to both organizational plaintiffs that they had members between 18 and 21 other than the named plaintiffs that were affected and harmed by the law. That's at pages 59 through 60, 122 and 127 of the Joint Appendix. And those allegations have to be construed in my favor at this posture, Mr. Jordan. Just a couple of questions. Which one of the statutes specifically, which one of the statutes are you challenging? Because 6106, the exceptions in 6106 allow your, assuming we allow the amendment, would allow Mr. Purcell to carry a firearm, correct? I'm sorry. They allow him to carry a firearm with a license, which he can't obtain. The licensure comes in for concealed weapons, right? That's correct, Your Honor. And during non-emergency periods, they do allow him to carry a firearm openly. Right now he can carry the firearm openly, correct? That's correct, Judge Restrepo. That, of course, circles back to our capable of repetition. So which one of the statutes specifically is it you're challenging? Your Honor, our injury comes from the combined force of the three statutes, 6106, 6107, and 6109. They combine together to create the situation that during declared emergencies, any manner of carry is foreclosed. We are happy and would have full relief. That's your argument, that the government could never be in a position where during a declared emergency? It's not everyone. It's just those 18 to 21-year-olds? Correct, Your Honor. That is certainly our position, yes. the government cannot tell 18 to 20-year-old adults that they cannot carry a firearm for self-defense in any manner. So that circles back to my earlier questions about the definition of an adult at the founding. It's not crystal clear what the definition of an adult and their legal rights were at the founding, correct? Well, they're adults today, Your Honor. We're back in the founding, all right? And, Judge Restrepo, what is clear is that at the founding, people were considered adults at different ages for different purposes, and the militia laws, with all due respect, Judge Restrepo, I think very clearly show us that for purposes of keeping and bearing arms. With all due respect, there was no clear definition as to what the age of majority was at the founding, correct? Your Honor, That's a simple yes or no. That is correct, Your Honor. So then under your logic, if there's no clear definition at the founding as to what the age of majority was, could the state impose restrictions on a 17-year-old? Your Honor, that would be a very different case. The historical evidence of the militia laws shows that very, very clearly at or near the time of ratification, every state coalesced at 18 as the age for militia service, and therefore we would say— Every state coalesced at the age of 18 for militia service? Yes, Your Honor. Within two years of ratification, every state did. So is it the case that your position boils down to the age of majority is not the key point? The question is what's the scope of the people? That's correct, Your Honor. Well, point number one, the question is, as a textual matter, what's the scope of the people? We would submit that Heller and Bruin answer that question, and then Bruin places the burden onto the state to come up with a historical tradition justifying its law. And it has to come up with a historical tradition, Bruin says, that's analogous in terms of its burden and in terms of its justification. And I'm pointing out that 18-year-olds couldn't— Hold on, I just want to be clear, because you're saying this is the analytical framework required by Bruin. First question is, what is the—does the right cover the people? Is this something that's covering the group in question? As a matter of plain text and structural arguments, I would say, Your Honor, those are the types of arguments that the Bruin court looked at under that first step to determine kind of the plain text presumptive prima facie meaning of the Second Amendment. So for our purposes, and I keep returning to the analysis that's called for here, under Bruin, first of all, Bruin requires us as judges to be, to some extent, historians, and to some extent, logicians. I say the latter because the command is that we look to or that we engage in analogical reasoning, correct? Correct, Your Honor. So your position is that 18- to 20-year-olds are part of the people unless we can find, through analogical reasoning, historical antecedents that would take them out of the people. Exactly. Is that correct? This may seem a minor point, and it may well be a minor point, but again, I'm looking for help in how to reason through in the Bruin regime these questions. I have a feeling we have not seen the last of these sorts of cases, and they will create interesting questions for district courts and the assemblage of records at the district court level through coming forth with historical evidence and raising evidentiary issues. So there are two terms that appear, relevantly similar and distinctly similar. Do you have any view on whether or not there is some kind of space between those two terms, whether the modifiers in any way have particular meaning in terms of our search for similarity, for analogical comparators? Well, Judge Smith, I believe this Court sitting on Bonk and the Range case held that indeed they do and that distinctively similar is a more fine-grained analogical requirement, and that's what applies in the absence of dramatic social or technological change. And that is certainly the standard that we would submit that applies here, given that children carrying firearms has been something that has occurred since time immemorial. All right. Thank you. Anything else? No? Okay. Well, I'll have you back on rebuttal. Thank you, Mr. Ohlendorf. We're here for counsel for the commission. Thank you, Your Honor. May it please the Court. My name is Daniel Mullen. I'm with the Pennsylvania Office of the Attorney General, and I represent the Commissioner of the State Police in this matter. What my friend is seeking from this panel is an advisory opinion on abstract legal questions. Of course, an advisory opinion assumes that there's not going to be another emergency tomorrow, right? We've heard the assertion that there's, on average, an emergency declared, what, every six months, and local emergencies as well as statewide emergencies. So let me start with the question we asked him about local emergencies. Does an emergency like the one that occurred in Philadelphia implicate the statutes in question 6106, 07, and 09? Only in that locality. But it does. So that within the city of Philadelphia, within the last month, 18- to 20-year-olds were told, it's unlawful for you to carry, period, right? Correct. I mean, Philadelphia is kind of a special case because there's a separate statute about open carry in Philadelphia that has not been part of this case up until now. And if there's an emergency proclamation that's tailored to a specific locality, it would prohibit open carry by this age group during that declared emergency. This confluence of statutes would do that. Okay. Correct. Okay. In light of that, I mean, I take it you're not contesting the accuracy of the assertion that these emergencies happen with some frequency? They do happen with some frequency. I think my friend overstates it somewhat. So in the emergencies they cite, they say there's been 45 since the year 2000. Only 29 of those have been statewide. Statewide or not, some group of people in the state were told, like in the city of Philadelphia this month, you can't carry. It's against the law. But I think the standard, Your Honor, is whether or not these specific – Only 29 over – Pardon? Can you repeat that, Your Honor? So more than one every year? You know, it varies from year to year. I mean, we go through several year periods where there are no statewide emergencies. So, for example, September 2003 to September 2005, no emergency. April 2007, February 2009, no emergency. So – I assume for the sake of discussion that we thought, boy, this is happening enough that it's not moot. It's not only capable of repetition. It appears to be repetitious indeed. And we thought, therefore, the issue was not moot. Just touch, if you would, for a moment on the standing issue. They say, look, we've got another person. We have associational standing. Why wouldn't we pay attention to that? Why are you fighting that? Because it's speculative that this one person that they've identified will ever have his rights curtailed. So let's look at when we filed our – That's not the issue whether his rights will ever be. I understand their argument to be we have associational standing because we have at least one member who fits this category now. We will always have one member who fits this category. And, therefore, as an association, we have the right. Do you have any law that suggests that that's not an accurate statement of associational standing? I think, broadly speaking, that's accurate. If it affects their members. But, again, I think it's speculative to suggest that it will affect this one member. So keep in mind, we filed our – Why is that relevant, Mr. Mullen? Why is it relevant if it affects this one member? If the association maintains standing, even if this one person is gone. I mean, their claim and their assertion, as I understand their argument, is, you know, we have an organization. People come in. People go out. Some members will age out, but they'll be members in that 18 to 21-year-old category forever. So we will always have somebody who this is affecting. What's wrong with the logic of that? I think it's unreasonable to draw that inference that they're always going to have members affected by this. We should assume. We should speculate that they won't. That somewhere in the state of Pennsylvania, they won't find somebody 18 to 21 who shares their view of gun rights and will join their association. That's the position you'd have us take. I don't think we should presume that's always going to be the case, that they're always going to have members affected by this law. But they have it now. You'd agree with that? They have one 19-year-old who can carry openly. So, again, he has his right to carry openly in public is intact. And now keep in mind, when we filed our supplemental brief arguing that this case was moot, in response they said, yeah, but the individual plaintiffs could be subject to the same action again. Here we are. We're not subject to that same action again. They have aged out. And so the same thing could happen with this 19-year-old. I'm not sure how that pertains to associative understanding. But let's move on from that and talk about Bondi, all right? Sure. You heard me quote that it would be odd language from Bondi, which you quoted in your letter to us. Yes, Rob. Here's the thing I've been struggling with. Maybe you can help us think it through. You know, even if we got past the language in, which does seem to me to, when I read it, I thought it was a little overstated. Widely adopted and widely approved of gun regulations. Even if we got past that and thought, oh, they were widely adopted and were widely approved of gun regulations at the time. The statement, it would be odd indeed if people who adopted the 14th Amendment did so with an understanding that would invalidate those regulations, made me wonder, well, how odd would it be to have the same constitutional right in the same language from the same amendment be given a different scope at the federal level and at the state level? Because at the federal level, the assertion in Bondi isn't, and I don't think could be, that somehow the adoption of the 14th Amendment changed the meaning of the Second Amendment as pertains to the federal government, right? So isn't the necessary implication of your argument and the necessary implication of what Bondi was saying that the Second Amendment means different things when the state regulates than when the federal government regulates? People have different rights when the federal government's regulating than when the state is regulating. Well, I don't think it would be that unusual to say whether it's state or federal, and I think, you know, Bruin suggests that it ought to be the same whether we're talking about state or the federal government. I don't think it's... He does say that, but how would you have something different? How could you not be in that position? If the 14th Amendment is to be measured, as Bondi says, in 1868, the scope of the Second Amendment is governed by Reconstruction-era laws, widely adopted, they say, how could it not end up being... I mean, the whole point of having the argument, there's no point to the argument unless one can say, look, it's different in 1868 than it was in 1791, right? Right, and I think it is. I think a useful comparison, Your Honor, might be the First Amendment. So if we look at, in the First Amendment, the phrase freedom of the press, at the time of the founding, that basically meant a prohibition on prior restraints, and that's it. And so that's why in the early republic, you know, we see things like the Sedition Act go unchallenged. It's not until Reconstruction where it gets incorporated to the states that we have what is essentially the modern understanding of the freedom of the press, whether it's the federal government or the state government infringing upon it. Isn't that the natural development of the law over time as people say, look, this is, that's what, we're not, it may not have been challenged in 1791, but we're challenging it now, and we think that the text of the thing can't cover this kind of behavior. I guess what I'm asking is, I never understood First Amendment law to be pinned on the idea that when the 14th Amendment was adopted, that changed the meaning of the First Amendment. I understood First Amendment law to be developed by different courts over time saying this is what the text means. Has anybody other than a couple of academics made the argument that what changed things was the adoption in 1868? Well, it is, you know, the argument by the academics that the court specifically cited. So, yeah, this is an unresolved issue, but I think the court tipped its hand in favor of the two academics, both of whom say, look to Reconstruction. Which court did that? Which court said Akhil Amar and Kirk Lash have it right, and that's what changed everything? They left it unresolved. I acknowledge that. But what I'm saying is they said there's a debate here, and then it cited two scholars, both of whom take the same position. There's a debate, but how could the position that's being taken not result in the same amendment meaning a different scope of right when the feds regulate it than when the state regulates it? How could it not mean that? Well, I think, again, McDonald, when it's incorporating the right, is focused on Reconstruction as to whether or not the right is incorporated to the states. That's just like a – you can go into your explanation if you want, but that appears to me to be a pretty straightforward question. Are you acknowledging that, yes, if we accept your position, there will be a difference between federal regulatory scope and state regulatory scope? Not if for federal we're also looking to Reconstruction. So how does the fact that the states – where's the logic of that? Bruin says 1791, and there's nothing about the states adopting the 14th Amendment that changes what bound the federal government in 1791, is there? Correct. I mean, so I think, you know, that's what makes this issue tricky. There's a problem in either direction. If we're binding the states to the 1791 understanding when they were not bound by the amendment, you know, so the problem exists in both directions. And I understand it's a tricky, unresolved question, Your Honor. What would you understand of who the rights, as it were, of 18- to 20-year-olds at the founding? My understanding is that they were considered infants in the eyes of the law at the time of the founding and didn't have independent Second Amendment rights for that reason. And again, I think that's confirmed by scholarly sources that, you know, postdate the founding and later, you know, statues from the Reconstruction era. But we're not called upon to look for scholarly readings, are we? I mean, Bruin directs us to regulation if it exists, right? Well, I think Bruin is looking at a variety of different sources, you know, and Heller as well. They're looking to 19th century commentators, including Thomas Cooley, one of the commentators we cite here, to figure out what they understood the scope of the right to be. So I don't think Bruin is simply looking at regulations, although obviously that's important. It's looking at legal definitions. It's looking at dictionaries. What else are we called upon to analogize to then, if not some form of regulation, be it statute, local law, state law? I think that's what we're, when we're doing a specific analogical analysis, that's what we're looking to. But when we're figuring out what is the scope of the right and how we're defining the people, for example, I think for that the court's looking to a variety of different sources. Statutes are one of them, but it's also looking at, you know, definitions and commentators, et cetera. Where do you get that? When it says, when Bruin says you look for historical analogs that are comparable, where do you pick up, and we mean academic writings and commentary? Yes. So, I mean, I think we're talking about two different things, I think. I mean, one is if you're deciding whether the specific regulation is analogous to other regulations, absolutely we're looking to statutes. But if we're talking about the sort of threshold question of who the people are, how do we define the scope of the right, then I think we're looking to a broader array of sources. And so that's what I'm saying, Your Honor. Okay. So for you to carry the day, you're asking us to come to the conclusion that at the founding, we the people did not include 18- to 20-year-olds? I think that's part of the analysis, Your Honor. That's one brick in the wall. But then we're looking at later history. And so, you know, when we're talking about Heller, McDonald, or Bruin, you know, as you said, we're not just mired in the 1790s. We're looking at the founding, and we're looking at the 100 years afterwards, and we're sort of collating all of those sources to figure out what's the scope of the right, what types of regulations were tolerated. And I think this debate about do we pick, you know, the founding versus Reconstruction, I think to have to definitively resolve that question, we need a kind of direct conflict between those two periods. The founding is saying A, and Reconstruction is saying negative A. I don't think we have that here. So you'd be just as happy if it were 1791? I don't think the court has to definitively resolve it here. I think at best what we have. Back in 1791, 18-year-olds were not among the people. Correct. And your authority for that is the age of majority. Because the second Militia Act, on which your colleague leans so heavily, indicates they were caring. And, in fact, you know, one would think that in the hinterlands of Pennsylvania in the late 18th century, nobody was going around asking for IDs. People were out shooting their food. As someone who lives in the hinterlands of Pennsylvania, there's still quite a few people doing that, I would point out. And? Look, Your Honor, the concerns at the time of the founding were very different. And Bruin acknowledges that, you know, the Second Amendment is flexible enough to allow societies to solve issues that were unthinkable at the founding. And one of those issues that we – That's – you have just put your finger on the point. It does matter. It does matter whether it's 1791 or 1868. Because in 1791, the attitudes about carrying weapons were such, or appear to be such, that you were not only allowed to carry, you were expected to carry at 18. You were required to be ready for militia service and a rifle put in your hand at the age of 18. That's their argument. What's the argument against that except, yeah, yeah, but sometimes in some instances in some states, mom and dad had to buy it for you? Well, it's not just that, Your Honor. I think, you know, those militia laws flunk the relevantly similar test. The how and the why of those laws are not what we're talking about here. That's not – those laws aren't aimed at solving a discrete public safety issue that was a concern beginning in the mid-1800s. What discrete public safety issue analog do you have? Because your only argument I've heard so far for 1791 is the age of majority, which has nothing to do with public safety. It was what the age of majority was. Right. And it didn't speak to, it didn't address public safety in any fashion. It was just what the age of majority was, right? Right. I mean, so at the time of the file, we have the general age of majority, and then we have the general proposition, which is that, you know, certain groups who are deemed a threat to public safety are outside the scope of the Second Amendment. Now, I understand that those laws are problematic for a variety of different reasons, you know, through a modern lens. But nonetheless, they – Those laws, how do those laws bear on 18- to 21-year-olds? I mean, if you want to get into range with us, I mean, we just dealt with this, and we looked at those things, and we said, yeah, that's not convincing us. Yeah, even in the context of a circumstance where somebody was convicted. But we're not talking about a convict. These are law-abiding people today, and looking back to 1791, we're talking about law-abiding 18- to 21-year-olds. Right, and I understand the court said in range that that was too broad for that specific as-applied challenge when you're talking about welfare fraud. But again, I'm just saying we're starting from the general proposition that the founders had no problem disarming certain groups that they deemed a threat to public safety. You couple that with the age of majority. You couple the – and then you – Because that's where it feels like you're putting the rabbit in the hat. What does disabling people who are thought to be a threat to public safety have to do with what was selected at that time to be the age of majority? What do you rely on to make that a link? Any more than saying, you know, his car is blue, therefore the moon circles the earth. Yeah, it's not that there's a specific link between those two things. I'm saying that's the sort of founding-era evidence that we have. And then beginning in the mid-1800s, there's a new problem that didn't exist at the founding, which is firearms violence by handguns, which were not mass-produced until later. They weren't common during the founding era. And so what I think is happening is – Sounds like you're saying it really does matter, 1868 or 1791, because it's the later-developing problem and the state's response to a later-developing problem that should inform this court, as it informed the Eleventh Circuit in Bondi, about how to resolve this, right? I mean, that's the whole point in Bondi. It starts off with terrible headlines, 18-year-old shoots this person, 19-year-old shoots that person, so-and-so kills this person, ripped from the headlines, surprise, shocker, reconstruction-era headlines. And that's the Eleventh Circuit's whole deal here is to say, look at how the problem developed, now look at 1868. That's the way you want – you're telling us that's the right way to look at it, and therefore 1868, right? If the court feels it must resolve this – Well, I'm trying to figure out if there's a way not to do it. Because I think – It just feels like you're trying to have it both ways. It doesn't matter, but then every time I'm pushing you on it a little bit, you're saying, no, it matters. It matters because all the reasons that are coming up are coming up later. Right, because I think even if we're saying it's the founding, we can still look to later history to confirm it. So I think what Bruin said about sensitive places is actually instructive on this point. It's saying that sensitive places laws that ban carrying and pulling places, for example, and it cites a Law Review article that collects statutes, the vast majority of those statutes are from the latter part of the 19th century. So even if we're talking about the founding, we're still looking at later history to confirm it. And that's my answer, Your Honor. Okay. Thank you, Mr. Nolan. All right. Thanks very much. I appreciate your argument. We'll hear from Mr. Nolan-Dorf on the bill. Thank you, Your Honors. I have just a couple of quick points. First of all, Judge Jordan, I have that passage from Bruin that I had in mind. It's on star page 2154 where the court says, quote, late 19th century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence. Thank you. On the Bondi issue and the 1791 versus 1868 question, I think Your Honors are thinking about this the right way, as I see it. Well, don't assume how we're thinking about it, but go ahead. I think there are three options here, Your Honor. Either as respect both the federal government and the state government, the Second Amendment has the meaning it had in 1791, or with respect to both governments, it has the meaning that it had in 1868, or it has different meaning with respect to one government rather than the other. Now, we know from Supreme Court jurisprudence from Malloy versus Hogan, McDonald, Kims, Ramos, that that last option cannot be the right option. That is the option that I took my friend to embrace. But we know from binding Supreme Court precedent that option is out. So we're left with the other two. I think the option of having it mean the same thing with respect to both governments as it meant in 1868 makes no sense. There's no precedent supporting that. The Supreme Court has always looked, with respect to the federal government, at founding era evidence. That's what it looked at in Heller. That's what it looked at in Bruin. It also makes no sense for the reason that I mentioned earlier, Your Honors, which is at 1868 the question put before the ratifiers is, do these rights apply to the states as well as the federal government? If you want to find out what the ratifiers thought about the scope of those rights, you have to look at 1791. So I think, Your Honor, we're left with. Because here at the podium and also in briefing, the commissioner's point has been the burden is on you, plaintiffs, in the first instance to show that 18 to 21-year-olds are within the people, understood as of 1791, to have the right to bear arms. Now, I understand you briefed that at length, but take on the argument that we're hearing that our understanding of what was going on in 1791 can rightly be informed by the later arising events, things happening, you know, look, mass production of pistols, ready accessibility of these weapons that made the world different, and that can inform the way you look at 1791. So, Judge Worden, there are a couple of things there, and I think a lot of them arise out of what I think is a fundamental misunderstanding that the commissioner has of the Bruin decision. So the way I read Bruin is it divides the line between text and history. For text, it places the burden on me. I have to show that under the plain text of the Second Amendment, excuse me, Your Honors, under the plain text of the Second Amendment, our proposed conduct falls within that presumptive scope of the text. All right, and then, okay. And the court, in answering that question. And their assertion, and you've heard some questioning about this, is it didn't because at least as of 1791, 18 to 21-year-olds weren't the people when it came to the Second Amendment because they couldn't buy a gun. They couldn't, you know, they could have one given to them for malicious service, but otherwise they weren't free to just have a firearm because they hadn't hit the age of majority. Well, Your Honor, so I think all of that historical evidence doesn't come in at the textual inquiry, and in fact I think the train has left the station on that. Heller defined the phrase the people as a matter of the presumptive meaning of the Second Amendment's plain text. It said it presumptively applies to all Americans. It said adults. All Americans? So you're saying, like, that presumptively the Eleventh Amendment applies to 3-year-olds. That's correct, Your Honor. Now, in range, this court said there's an important distinction between who is among the people for purposes of the Second Amendment's presumptive textual reach and what authority does the government have to limit the rights of certain people. So in range, I read range to say that, yes, convicted felons, violent felons, are part of the people for purposes of the Second Amendment, notwithstanding Judge Risrepo, Heller's offhand reference to law-abiding citizens. I think they referred to adults, too, didn't they? That's why I looked your way, Judge Risrepo, because in the same offhand way that the court in Heller and Bruin referred to law-abiding citizens, it referred to law-abiding adult citizens. Those are an offhanded comment by the Supreme Court. That's correct, Your Honor. Range clearly holds that. Neither of those statements were at issue in Heller or Bruin. And what the court did in range is said, under the presumptive reach of the Second Amendment applies to all Americans. Then we look to history, and when we turn to history, the burden shifts to the state, and it shifts to the state to identify historical firearms regulation, not some law review article written by some academic, but historical regulations. You don't disagree that, I guess, you're saying, okay, the people is the people. So Sally in her crib is a person. That's correct, Your Honor. And presumptively the Second Amendment applies to her. But then the state could say, obviously, we're not giving guns to infants in their crib. But at that point, it's up to the state to be justifying that kind of regulation. That's how the burden shifts? That's exactly how I read it, Your Honor. Then the answer to their point is, yeah, in 1791, they said 18 to 21-year-olds were still, in the legal technical sense, infants. They hadn't reached the age of majority as of 1791. So that's a regulation. It's hitting them. That's right, Your Honor. And so then under the second step, we look to analogical reasoning from regulations, and Bruin says you look to the nature of the burden imposed and the nature of the justification. And here the burden imposed by a rule that 18-year-olds can't enter into contracts except for necessities is nowhere in the ballpark of a restriction on carrying firearms. And we know that that type of reasoning wasn't understood to restrict 18-year-olds from carrying firearms from the militia laws. Okay. All right. Thank you, Your Honor. Thanks very much, counsel. We appreciate the arguments. We've got the matter under advisement.